UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

| | |
|---|---|
| SADE COLLEY,<br><br>      Plaintiff,<br><br>v.<br><br>FRITSCH BAKERY TECHNOLOGIES GMBH & CO. KG,<br><br>      Defendant. | CIVIL ACTION NO.:  3:24-4143-MGL<br><br><br>**COMPLAINT** |

Plaintiff Sade Colley ("Colley"), by and through her undersigned counsel, complains of Defendant Fritsch Bakery Technologies GmbH & Co. KG ("Fritsch"), as follows:

**PARTIES, JURISDICTION, AND VENUE**

1. Colley is and at all relevant times was a citizen of South Carolina and resides and at all relevant times resided in South Carolina.

2. Fritsch is a corporation incorporated in and operating from its principal place of business in Markt Einersheim, Germany.

3. Machines and parts manufactured by Fritsch presently are and at all relevant times were sold worldwide including in the United States.

4. Fritsch designed, manufactured, and sold the machine at issue in this case with knowledge and the intent that it be placed into operation and continuously used in a baking business in West Columbia, South Carolina.

5. Fritsch prepared machine plans and diagrams with notations indicating Fritsch's intent that the machine be installed and used in West Columbia, South Carolina.

1

6. Fritsch installed and commissioned the machine at issue in this case in West Columbia, South Carolina.

7. Fritsch purposefully availed itself of the privilege of conducting business in South Carolina and thereby invoked the benefits and protections of South Carolina and federal laws.

8. The Court has personal jurisdiction over Fritsch.

9. The Court possesses jurisdiction over this matter pursuant to 28 U.S.C. § 1332 because the parties are completely diverse and the amount in controversy exceeds $75,000.00.

10. Venue is appropriate in the South Carolina District Court, Columbia Division because a substantial part of the acts and omissions giving rise to this action occurred in Lexington County, South Carolina.

## FACTUAL BACKGROUND

11. Fritsch designed, manufactured, sold, supplied, installed, and commissioned a bakery production line—"Breadline #2"—with multiple machine components to Aspire Bakeries, LLC ("Aspire") for and at Aspire's bakery facility located at 167 Overland Drive in West Columbia, South Carolina (the "Bakery").

12. One of the component machines in the production line is a "Star Roller Dough Portioner" (the "Roller"):



13. In the production line, dough from a conveyor above dumps into a hopper at the top of the Roller.

14. The dough is then pulled down through the machine and cut into uniform portions by two spinning rollers which each have three protruding metal vanes:



 

    15.    After exiting the bottom of the Roller, the dough is conveyed down the production line where it passes through various machines all designed, manufactured, sold, supplied, installed, commissioned, and serviced by Fritsch which form and shape the dough for baking.

4

 

16. The Roller and the other machines making up the production line were all designed, manufactured, sold, supplied, installed, commissioned, and serviced by Fritsch.

17. As designed, manufactured, sold, supplied, installed, commissioned, and serviced by Fritsch, the Roller and the other machines making up the production line were and are all controlled by a single electronic control system.



5

18. On April 8, 2023, Colley was working as an employee of Aspire at the Bakery.

19. The production line operates for six days each week, and the production line is taken out of operation and cleaned on the seventh day.

20. On April 8, 2023, the production line was undergoing the weekly routine cleaning.

21. On April 8, 2023, as part of her employment duties and as directed by Aspire and Fritsch, Colley proceeded to clean the Roller.

22. Fritsch supplied "operating instructions" for the Roller to Aspire.

23. Fritsch's operating instructions for the Roller directed Aspire and its employees to "[c]lean the unit by hand inside and outside with water, a cloth and a brush."

24. The Roller had controls and hydraulics for raising the hopper to allow access for cleaning and maintenance.



25. Colley used the controls and hydraulic components of the Roller to lift the hopper.

26. The Roller was not intended to, did not, and would not receive, cut, and portion dough with the hopper raised.

27. The sole purpose of the hydraulic lifting function of the hopper was to allow a person to access the interior of the Roller for cleaning and maintenance.

28. Following Fritsch's operating instructions, Colley climbed into the opened Roller to clean the interior of the hopper and the internal components of the Roller.

29. While Colley was cleaning the Roller and without warning, the Roller began operating and the turning rollers pulled in and violently cut and crushed Colley's feet and lower legs.

30. Colley remained trapped with the turning rollers crushing her feet and legs and screaming in pain and terror for an extended period of time before other Aspire employees understood the emergency and shut off the Roller.

31. Colley was rushed to the hospital where she was treated for acute blood loss and injuries to her feet and legs.

32. Colley experienced extreme physical injuries, pain and suffering, and psychological injuries caused by her feet and legs being crushed by the Roller.

33. In addition to other injuries and treatments, Colley suffered multiple, open fractures of the tibia and fibula bones in both of her legs and had multiple pieces of hardware and screws surgically implanted in her legs to repair the fractures.

34. Following the surgery, Colley was physically limited in her ability to walk and carry-on normal daily activities.

35. While Colley made significant improvements since the incident in her ability to walk and carry-on normal activities, for the remainder of her life Colley will suffer permanent physical impairment and physical limitations caused by the Roller.

36. Colley also suffered and continues to suffer psychological injuries caused by the Roller including post-traumatic stress, nightmares, anxiety, and distress.

37. On April 8, 2023, Colley was cleaning the Roller in a manner contemplated and directed by Fritsch.

38. On April 8, 2023, Colley did not know the Roller was energized and capable of operation when the hopper was lifted.

39. Fritsch's operating instructions acknowledge that a person coming into contact with operating rollers inside the Roller can crush the person.

40. Fritsch's operating instructions acknowledge that the Roller having the capability of operating while the hopper is lifted would present an unreasonable safety hazard to persons using the Roller.

41. Fritsch's operating instructions provide that the "power supply is interrupted: when the hopper is lifted."

42. The machine design and manufacturing principles and standards recognized at the time of the design, manufacture, sale, installation, and commissioning of the Roller in the Bakery provided that machine components that both present a hazard to persons coming into contact with the components and require cleaning by hand be deenergized when accessed for cleaning.

43. Fritsch sold, supplied, installed, and commissioned machines at the Bakery, including the Roller, improperly and in a defective condition such that the Roller was energized and capable of operation when the hopper was lifted.

44. The Roller being energized and capable of operation when the hopper was lifted was an unreasonably dangerous condition.

45. The Roller being energized and capable of operation when the hopper was lifted was a defective condition that proximately caused Colley's injuries.

46. Alternatively, if the Roller was designed, manufactured, sold, supplied, installed, and commissioned without any component or function designed to deenergize the Roller when the hopper was lifted, the Roller was designed to be unreasonably dangerous.

47. If the Roller was designed, manufactured, sold, supplied, installed and commissioned without any component or function designed to deenergize the Roller when the hopper was lifted, an alternative design existed and was reasonably available that would have prevented Colley's injuries.

48. An available alternative design was to include a sensor indicating when the hopper was lifted and programming the electronic controls of the Roller such that the machine was deenergized when the hopper was lifted, as contemplated by Fritsch's operating instructions.

49. An available alternative design was installing an interlock on the hopper and the body of the Roller such that the electrical connection is broken and the Roller is deenergized when the hopper is lifted.

50. The reasonableness and availability of the inclusion of an interlock in the design of the Roller is shown by the installation of an interlock on the Roller *after* Colley was injured by the Roller.



51.     The danger posed by the Roller being energized and capable of operation when the hopper is lifted is a substantial danger as shown by the physical injuries suffered by Colley.

52.     The available alternative design would not cause a substantial increase in the price of the Roller considering the substantial cost of the Roller and the extreme physical injuries Colley suffered.

53.     The available alternative design would not cause any decrease in the functioning or utility of the Roller.

54.     The available alternative design would not create any safety concerns.

55.     Fritsch failed to warn Colley of the unreasonably dangerous condition of the Roller.

56.     The Roller and the associated operating instructions and other materials failed to warn Colley to not enter the Roller when the hopper was lifted.

57.     The operating instructions for the Roller instructed Colley that the internal

components needed to be cleaned by hand, and the only feasible method for Colley to perform that cleaning was to enter the Roller.

58. The Roller and the associated operating instructions and other materials did not warn Colley that the Roller was energized and capable of operation when the hopper was lifted.

59. The operating instructions for the Roller informed Colley that the Roller was not energized and was not capable of operation when the hopper was lifted.

**FOR A FIRST CAUSE OF ACTION**
**Strict Products Liability**

60. Plaintiff realleges the allegations in the preceding paragraphs as if fully set forth herein.

61. Defendant had a duty to design, test, manufacture, assemble, install, commission, and inspect the Roller and the other machines in the product line so as to not subject users to a machine in a defective and unreasonably dangerous condition.

62. Defendant breached its duty to design, test, manufacture, assemble, install, commission, and inspect the Roller and other machines in the product line so as to not subject users to a machine in a defective and unreasonably dangerous condition.

63. The Roller was defective and unreasonably dangerous.

64. The Roller was manufactured, sold, supplied, installed, and commissioned in a defective and unreasonably dangerous condition because the Roller was energized and capable of operating when the hopper was lifted.

65. Alternatively, the Roller was defectively designed in a manner rendering it unreasonably dangerous to Colley.

66. The Roller was defectively designed because the Roller remained energized and

11

capable of operating when the hopper was lifted.

67. An available alternative design existed at the time the Roller was designed, manufactured, sold, supplied, installed, and commissioned including a sensor indicating when the hopper is lifted and programming the electronic controls for the Roller so as to deenergize the Roller when the hopper is lifted or installing an interlock at the intersection of the hopper and the base of the Roller such that the electrical connection at the interlock is broken and the Roller is deenergized when the hopper is lifted.

68. The available alternative design would have prevented Colley's injuries without impairing or without substantially impairing the Roller's utility.

69. The available alternative design was recognized, economically feasible, and technologically feasible at the time the Roller was designed, manufactured, sold, supplied, installed, and commissioned.

70. The Roller was defective and unreasonably dangerous because it was designed, manufactured, sold, supplied, installed, and commissioned without warning users of the danger that the Roller would commence operating when the hopper was lifted and the user was cleaning the hopper and internal components.

71. The Roller was defective and unreasonably dangerous because it was designed, manufactured, sold, supplied, installed, and commissioned in a condition where the Roller was energized and could commence operating when the hopper was lifted for cleaning and did not warn users to not climb into the Roller or to not clean the Roller by hand.

72. The Roller was defective and unreasonably dangerous because it was designed, manufactured, sold, supplied, installed, and commissioned in a condition where the Roller was

energized and could commence operating when the hopper was lifted for cleaning and the operating instructions stated the Roller was deenergized and could not operate when the hopper was lifted.

73. Defendant's breaches of its duties and the defective and unreasonably dangerous condition of the Roller proximately caused Colley's injuries.

74. As a direct and proximate result of Defendant's breaches of its duties and the defective and unreasonably dangerous condition of the Roller, Colley sustained and will sustain injuries and damages including:

    a. Multiple, open fractures of the tibia and fibula bones in both of her legs;

    b. Surgery to repair the multiple, open fracturs of the tibia and fibula bones in both of her legs;

    c. Pain, strains, tears, and fractures about various parts of her body including her legs;

    d. Psychological injuries and emotional trauma including post-traumatic stress, nightmares, anxiety, and distress;

    e. Permanent physical impairment;

    f. Physical pain and discomfort; and

    g. Inability to perform daily living activities that she performed and enjoyed before the injuries.

**FOR A SECOND CAUSE OF ACTION**
**Negligence**

75. Plaintiff realleges the allegations in the preceding paragraphs as if fully set forth herein.

76. Fritsch owed a duty to persons using the Roller, including Colley, to design,

13

manufacture, install, and commission the Roller in a manner that did not create an unreasonable risk of harm.

77. Fritsch breached its duties to Colley.

78. Fritsch was negligent, grossly negligent, willful, wanton, and reckless in designing, manufacturing, installing, and commissioning the Roller in a manner creating an unreasonable danger to persons using the Roller.

79. Fritsch was negligent, grossly negligent, willful, wanton, and reckless in designing, manufacturing, installing, and commissioning the Roller in a condition where the Roller was energized and capable of operating when the hopper was lifted.

80. Alternatively, Fritsch was negligent, grossly negligent, willful, wanton, and reckless in designing the Roller so that it was energized and capable of operating when the hopper was lifted.

81. Fritsch was negligent, grossly negligent, willful, wanton, and reckless in failing to warn users of the Roller of the danger of the Roller commencing operating while the hopper was lifted and a user was cleaning the Roller.

82. Fritsch's design, manufacture, installation, and commissioning of the Roller in a manner where the Roller was energized and capable of operating when the hopper was lifted falls below the level of care a reasonable machine designer and manufacturer would exercise and falls below the level of care recognized in the industry.

83. Fritsch's negligent, grossly negligent, willful, wanton, and reckless design, manufacture, installation, and commissioning of the Roller proximately caused Colley's injuries and damages.

84. As a direct and proximate result of Defendant's breaches of its duties and negligent acts and omissions, Colley sustained and will sustain injuries and damages including:

   a. Multiple, open fractures of the tibia and fibula bones in both of her legs;

   b. Surgery to repair the multiple, open fracturs of the tibia and fibula bones in both of her legs;

   c. Pain, strains, tears, and fractures about various parts of her body including her legs;

   d. Psychological injuries and emotional trauma including post-traumatic stress, nightmares, anxiety, and distress;

   e. Permanent physical impairment;

   f. Physical pain and discomfort; and

   g. Inability to perform daily living activities that she performed and enjoyed before the injuries.

WHEREFORE, Plaintiff demands a jury trial and prays for judgment against Defendant for actual and punitive damages and for such other and further relief as this Court deems just and proper.

                THE STEINBERG LAW FIRM, LLC
                P.O. Box 9
                Charleston, SC 29402
                (843) 720-2800

                By: _____s/Elliotte Quinn_____

F. Elliotte Quinn IV
SC Bar No.: 100450
USDSC Fed. ID No.: 12563
equinn@steinberglawfirm.com

Michael Jordan
SC Bar No.: 74902
USDSC Fed. ID No.: 10304
mjordan@steinberglawfirm.com

*Attorneys for Plaintiff*